AO 91 (REV.5/85) Criminal Complaint

AUSA Heather K. McShain (312) 353-1414

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

**FILED**

v.

DANIEL DVORKIN

JUL - 3 2012
7-3-12
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER:

**UNDER SEAL** 12 CR 500

MAGISTRATE JUDGE KIM

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: beginning at least as early as April 4, 2012, to May 18, 2012, at Oakbrook Terrace, Illinois, in the Northern District of Illinois, Eastern Division, DANIEL DVORKIN, defendant herein:

> with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States, namely, Title 18, United States Code, Section 1958(a), and under circumstances strongly corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other person to engage in such conduct;

in violation of Title 18, United States Code, Section 373(a). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
ADAM M. HOOGLAND
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 3, 2012
Date

at

Chicago, Illinois
City and State

YOUNG B. KIM, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                         )    ss

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, ADAM M. HOOGLAND, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2005. My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2.      This affidavit is submitted in support of a criminal complaint alleging that Daniel Dvorkin has violated Title 18, United States Code, Section 373(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging Dvorkin with solicitation to commit a crime of violence, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, reports I have read related to this investigation, conversations I have had with law enforcement officers and others who have knowledge of the events and circumstances described herein, interviews of witnesses and other individuals, and recordings.

**April 5 - Dvorkin Leaves Voice Mail Message for the Cooperating Witness**

4.      The FBI interviewed the cooperating witness on April 16, 2012, and on several occasions afterwards.[1]

5.      On April 16, 2012, FBI agents retrieved a voice mail message that the cooperating witness had saved on his/her cell phone.  Phone records confirm the incoming call from Dvorkin's business line, (630)396-2500 on April 5, 2012, to the cooperating witness's cell phone.  The voice mail message has been preserved, and in the message Dvorkin states the following:[2]

> [Cooperating witness], Dan Dvorkin. I have an idea, call me tomorrow in the office between nine to five or call me on my cell phone tomorrow or if you want to, call me tonight before six, (630)921-0606.

---

[1]The cooperating witness provided this information to the government voluntarily. The cooperating witness has not been charged with any crime, and has no criminal history. Nor has the government paid the cooperating witness for information. My understanding is that the cooperating witness has provided information out of concern regarding the conduct described in this affidavit. I believe the cooperating witness's information is reliable, based on my discussions with the cooperating witness and corroborating evidence we have gathered during the investigation, some of which is described here.

[2]At various points in the Affidavit, I will offer my interpretations of certain recorded conversations in brackets and otherwise.  My interpretations of these conversations are based on my knowledge of the investigation to date, the content and context of the conversations, prior and subsequent conversation, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations.  Finally, the draft summaries of conversations do not include all potentially criminal conversations recorded during this investigation, or all statements or topics covered during the course of the recorded conversations.  They do not represent finalized transcripts, are in draft form, and may not represent the entire conversation that occurred between the identified individuals.

**April 6 – Cooperating Witness Meets with Dvorkin at his Office**

6.    According to the cooperating witness, as a result of Dvorkin's April 5 voice mail message, on April 6, 2012, the cooperating witness drove to the office of Dan Development Limited, located at 1 TransAm Plaza, Suite 120, in Oakbrook Terrace. The cooperating witness recounted to agents that when he/she arrived at the reception desk of Dan Development Limited's office, Dvorkin happened to be in the vicinity of the reception desk and called the cooperating witness's name. According to the cooperating witness, Dvorkin asked the cooperating witness to walk with him, and they walked outside into the parking lot. The discussion in the parking lot was not recorded.

7.    The cooperating witness recounted that once in the parking lot, Daniel Dvorkin stated words to the effect of, "I have a problem." Dvorkin handed to the cooperating witness a document. The cooperating witness provided a copy of this document to the FBI. The document is a judgment. The judgment orders Dvorkin (and several corporate entities affiliated with Dvorkin) to pay, in total, over $8.2 million to the plaintiff in the lawsuit, a corporate entity. While the plaintiff corporation's name does not appear in the caption, the body of the judgment reflects that payment is to be made to this entity, and we have confirmed that the plaintiff corporation is owned by the intended victim and a family member of the intended victim. Review of records obtained from the Clerk of the Circuit Court of DuPage County, as well as information and records obtained from attorneys who represent the plaintiff corporation, confirm existence of the lawsuit and judgment, and that the entity is owed the judgment

3

amount. The attorneys for the plaintiff corporation also confirmed that the entity is co-owned by the intended victim.

8.      According to the cooperating witness, he/she skimmed through the document that Dvorkin handed to the cooperating witness and commented to Dvorkin that this looked bad. Dvorkin stated words to the effect of, "I want this guy to stop breathing." Dvorkin then indicated that this "guy" (meaning the intended victim) was a lawyer. Dvorkin indicated that he, Dvorkin, picked up a bad judge in DuPage County, that he got "tagged" for it, and that if this "guy" died, Dvorkin would win his appeal. Dvorkin indicated that he was appealing the judgment, but believed that if the intended victim were dead, then that person would be unable to respond to the appeal. Dvorkin stated that he would then be "free" of paying the judgment. Dvorkin also indicated that he had considered having this individual beat up by someone pretending to be in the mob, but that "wasn't enough" because the "guy" needed to stop breathing.

9.      During this same conversation, according to the cooperating witness, Dvorkin also indicated that he had $35,000 in cash saved up and could come up with another $15,000 to pay before someone killed the intended victim. Dvorkin also stated words to effect of, he would then pay $50,000 after the murder. Dovrkin then showed the cooperating witness a wad of cash in his front pants pocket. Dvorkin also asked the cooperating witness how much the cooperating witness thought it would cost to do "this," which the cooperating witness understood to mean kill the intended victim, and the cooperating witness indicated that he/she had no idea. Dvorkin also indicated that he could provide the killer with a flight on a private jet so that his name would not

4

appear on commercial flight records. Dvorkin also indicated that he would want to be out of the country when the murder occurred so that he would not be a suspect. The cooperating witness indicated to Dvorkin that he/she might know someone in Florida who could do it.

10. According to the cooperating witness, Dvorkin then walked with the cooperating witness back into the building, into the Dan Development Limited office, and stopped in the area outside of what the cooperating witness believed to be Dvorkin's office door. Dvorkin asked an employee for some documentation, which Dvorkin then provided to the cooperating witness, consisting of two documents. According to the cooperating witness, when Dvorkin handed him/her these documents, the cooperating witness understood them to contain information regarding the intended victim.

11. The cooperating witness provided the two documents to the FBI. The first document is a LinkedIn printout with information about the intended victim.[3] The document is a color printout and bears a photograph at the top of a male, next to a name. This appears to have been printed out on April 2, 2012, and in the margin handwriting appears that states, "Not sure if this [*sic.*] your guy!" The cooperating witness confirmed that the handwriting is not his/hers.

---

[3] According to its website, "LinkedIn operates the world's largest professional network on the Internet with 161 million members in over 200 countries and territories." The website further explains, "LinkedIn connects you to your trusted contacts and helps you exchange knowledge, ideas, and opportunities with a broader network of professionals."

5

12.     The second document is a printout from Justia.com, which also identifies the intended victim.[4] This was also printed on April 2, 2012.

13.     Following this meeting, on April 6, 2012, the cooperating witness telephoned the Oakbrook Terrace Police Department. We have confirmed this through the cooperating witness's phone records and interviews of the officer. Oakbrook Terrace Police Department contacted the FBI who, in turned, contacted the cooperating witness.

**April 18 – Call from the Cooperating Witness to Dvorkin**

14.     On April 18, 2012, at the behest of FBI agents, the cooperating witness called Dvorkin to follow up on their April 6, 2012, conversation. The call was made in the presence of agents and recorded. The call included the following conversation:

CW:     Good morning, Dan, how are you doing?

DD:     Well, I still have that problem but we're going to chat about it over in court on the 26th.[5]

CW:     Oh . . .

DD:     But if you ever, uh, go see . . . is it your parents who live in Florida?

CW:     Yeah, I've got parents in Florida. Yeah, I mean, I, I went down there, but I'd rather, you know, not talk about that. I wanted to tell you I was going to stop by to, ah, bring a check over and maybe you know if you're there, got time, we can talk. If not, we can talk another time. I'm not ah . . .

---

[4]Justia.com is a website used as a legal resource. One feature includes a database where you can search by lawyer name.

[5]Attorneys who represent the intended victim confirmed that a court hearing in the DuPage County case did occur on April 26, 2012.

DD:     I've got lots of time today.

CW:     Do ya?

DD:     Yeah, yeah.  I just.

CW:     Alright.

DD:     Too bad you went already.

CW:     OK.

DD:     Alright.

CW:     Yeah, I just meant I went down said hi to the family and stuff and
        then ah came back on Sunday.  So.  Um.  I'll talk to you when I get
        over there . . .

## April 18 – The Cooperating Witness and Dvorkin Meet at His Office

15.     Following their phone conversation, at the behest of law enforcement, the
cooperating witness then drove to Dvorkin's office at 1 TransAm Plaza, Suite 120,
Oakbrook Terrace, Illinois.  Agents equipped the cooperating witness with an audio
recording device, and followed him/her to and from Dvorkin's office.  While portions of
the conversation covered non-relevant topics, the following conversation occurred
between Dvorkin and the cooperating witness:

CW:     I went to Florida on Friday and, ah, spent the day with my family
        went over to his house and talked to him and he said, ah, no
        problem, but he's concerned whether the money is really there and
        I said, ah, I know the guy it's, his money's there, it's good.

DD:     Well it'll be deposited (UI)

CW:     It ain't a problem . . .

DD:     . . . and your safe before . . .

7

CW:     Yeah, well, ah, I don't know if I wanted to do that much. You know what I'm thinkin', ah, that you just meet with the person or something like that. I mean I'll do it if you really want me to, but I, I just don't, you know I don't wanna, I wanna stay out of it if I can 'cause my family and everything, Dan, you know.

DD:     Yeah, I understand.

CW:     But, but, ah, the guy is, ah, if you st –, if you want it done he can get it done within 2 days.

DD:     And what's the . . .

CW:     And he doesn't wanna, any travel there he wants to get there on his own and everything by himself.

DD:     Wonderful.

CW:     Yeah, he doesn't want any of that. And he also doesn't wanna know your name, he didn't want you to know his. (UI)

DD:     I, I don't wanna know his. I don't want . . .

CW:     His name, the name he gave me is Johnny and, ah, that would be it and, and I would recommend you know that if you do meet him somewhere that you just don't do it around here, don't do it around, you know do it at some restaurant or somethin' like that, but he says he needs, ah, he needs a day's notice at minimum and then it would take 2 to 3 days.

DD:     Yeah what's the fee?

CW:     Ah, well, I mean that's you get to negotiate with him I guess, ah, but I, you know I'm guessing somewhere around $80,000. You know you can, you can work it out, but he'd want half up front and half when it's over. He'll bring ya either a picture or you'll hear about it, but I don't know how he's gonna . . .

DD:     Okay.

CW:     I mean I don't know how to do the deposit. I don't know.

DD:     I've been accumulating, I got lucky, some guy owed us (UI)

8

CW:   Yeah.

DD:   Well, not all of it was mine . . .

CW:   Maybe it'll sit.

DD:   ...I got a partner in the building.

CW:   Yeah.

DD:   And he (UI).

CW:   Oh.

DD:   I think most of it.

CW:   Okay, good.

DD:   We got lucky.  So where I have (UI) I'm up to 50.

CW:   Okay.

DD:   Well that's enough to get him started you know and then (UI)...

CW:   Well then I have to figure out how to get (UI).

DD:   Right, right.

CW:   And then the,...

DD:   (UI).

CW:   ...the thing is that he, ah, he was very adamant about, you know, um, no names.

DD:   I mean just (UI).

CW:   I haven't said any names.  I haven't said anything like that and he says I don't want him to know my name.  I don't want...and...

DD:   And I don't wanna know his name.

9

CW:    Right, exactly. I mean it's just a lot easier and whatever happens you know that's how it is and, ah, and then I don't wanna be...what I, what I'm willin' to do is I'll make the introduction if you want me, if you're safe, com, comfortable with that I'll do that, but I don't wanna hear any of the talking or nothin' I'm just gonna go.

DD:    Right, right, no.

CW:    And, ah, if you, otherwise you tell me how you (UI) when.

DD:    Well, no I'm just gonna tell him look, this is money I've been saving for years so none of it is recent. It can't be traced back. So I really don't have a, here's what I have and...

CW:    Mm hm.

DD:    ...here's...what you can have.

CW:    Right. Yeah.

DD:    (UI).

CW:    And, and, and I told him I said you know that there'd probably be a way to, ah, get him to Texas, you know without having, you know on a commercial airlines or something and he says I'll get there myself. I don't wanna have nothin' to do with that and, ah, he says I, I'll, I'll, he says don't worry about it I'll get there. And I said well, give me a time line and said a couple days. You know so and, ah,...

DD:    Well this goes back to court on the 26th which is Thursday.

CW:    The 26th, okay.

DD:    At (UI).

       (PAUSE)

CW:    What, what is the bond?

DD:    (UI).

CW:    Yeah you said that. You put up a bond or something?

10

DD:   Well,...

CW:   It's like a guarantee?

DD:   ...I got, it's guarantee that if the appeal goes (UI) he can go after the property. It's not cash. It's 5 pieces of property or 6 pieces. Farnsworth, 18th, ah, they can't, ah, Halsted and Lake are partial interest so is 18th, but then Highland the retail is clear. So that they would grab in a heartbeat.

CW:   Where does that put you though if that all happens?

DD:   Well I lose many millions of dollars.

CW:   But all the properties and everything?

DD:   Well it's not all the properties. (UI).

CW:   Okay.

DD:   But it won't be for 2 or 3 years. And I might win the appeal.

CW:   Right. Yeah.

DD:   I get about a 35% chance (UI) . . . .

CW:   Yeah, sure. Yeah if you can, ah, you can afford some of that the evidence that was presented and get it thrown out and not be presented at all, you know or...

DD:   The time line don't matter I, I gotta, you know, see I don't wanna take any cash out 'cause then it's traceable.

CW:   You need to have it already out.

DD:   Well, (UI) time...

CW:   And that's the other thing.

DD:   ...I've been saving it in bits and pieces. You know every 3, 4 years. So this completely...

CW:   Okay.

11

DD: ...(UI).

CW: Alright.

DD: Ninety percent of it's in hundreds, (UI) in fifties, twenties, nothin' smaller than that. I don't think maybe, ah, a thousand in twenties.

CW: Yeah I don't at that, I don't think the denominations gonna matter. I'm just, um,...

DD: (UI).

CW: ...you know you just don't wanna, you don't wanna be pullin' somethin' out and then, you know they start seein' big cash withdrawals or anything like that, you know.

DD: There'd be no cash withdrawals.

CW: Yeah, okay. Now I, I, I trust this guy a hundred percent 'cause I know what he's done in the past. So I'm not concerned about that. He's probably gonna be concerned with you, ah, more than anything. So I think when you have the conversation you just be very, you know very clear at, ah, you know and I don't know...

DD: (UI) I would meet him at the shopping center and I would...

CW: That's good.

DD: ...park my car far away.

CW: Mm hm. You guys sit in the car or something or...

DD: No, no, no.

CW: ...(UI) out.

DD: I'll meet him (UI). I will just...there's outside tables.

CW: Okay.

DD: And, ah, I just...

12

CW:   Have coffee or something, you know.  Yeah.

DD:   Yeah.

CW:   Yeah.

DD:   Ice tea (UI).

CW:   Well, alright, that's, ah, (UI).

DD:   (Sneezing) (UI).

CW:   Now, now when do you, ah, when do you know if, ah,...

DD:   What I have...

CW:   ...after the 27th you said, 26th?

DD:   After the 26th.  That's next week on Thursday.

CW:   Alright.  Well, why don't we put together a, ah, a little code or something.  If you just, just call me up and say, you know...yeah that, that (UI) has gone through or somethin' like that then I'll...

DD:   No, no, no, I'll say did you serve the guy and let's pick a town.

CW:   Waterman.

DD:   Matteson.

CW:   Matteson, okay.  That perfect, perfect.  Okay.

DD:   Are you able to serve that guy my lawyers (UI).

CW:   Okay.  And that's gonna mean it's a yes and I start, and I'll set up the meeting.

. . .

13

**April 30 and May 3 – Dvorkin and the Cooperating Witness Talk by Phone**

16.     Dvorkin called the cooperating witness on April 30, 2012. This conversation was not recorded. Agents interviewed the cooperating witness following this call, and the cooperating witness provided the following account. According to the cooperating witness, among other topics, Dvorkin stated words to the effect of, "By the way, that thing we are talking about." The cooperating witness took this to be a reference to Dvorkin's attempts to find someone to murder the intended victim. Dvorkin indicated that he knew a friend who has a "guy" who could do it for less, and that Dvorkin would be in touch next week if he still needed the cooperating witness to find someone. The cooperating witness took this to mean that Dvorkin would contact him next week if he still needed to find someone to murder the intended victim. The cooperating witness asked Dvorkin how his court date went last week, and Dvorkin indicated that it did not go well.

17.     On May 3, 2012, the cooperating witness received a call from Dvorkin. While this call was not recorded, the cooperating witness was instructed by agents prior to the call to arrange a meeting with Dvorkin. According to the cooperating witness, among other topics, Dvorkin and the cooperating witness agreed to meet on Monday, May 7, 2012.

**May 7 – The Cooperating Witness and Dvorkin Meet at Dvorkin's Office**

18.     On May 7, 2012, at law enforcement's behest, the cooperating witness drove to Dvorkin's office at 1 TransAm Plaza, Suite 120, Oakbrook Terrace, Illinois. Prior to the meeting, FBI equipped the cooperating witness with a recording device (to

record both audio and video) and followed the cooperating witness to and from the meeting, at which time FBI recovered the recording device. While portions of the conversation covered non-relevant conversation, the following conversation occurred between Dvorkin and the cooperating witness:

> DD: Well here's what happened. I told you I had one other avenue . . . . The other avenue only wanted 10% down. As you know, there are no refunds in this line of work. And your guy wanted 50% down. And they were less than half the price. I don't know which group finally took it. He had two groups, one was Mexican and one was Russian. I actually don't want to know. So if the subject does happen, he's got the [UI] so it doesn't come back to him. If it don't go back to him, it can't come back to me. Now I'm involved with him in other ways. So he stuck out the 10% for me. Which I'll pay him back. But they promised they would do it two weeks from last Friday.

19.     In response to the cooperating witness's questions regarding what to tell "my guy," Dvorkin made the following statements:

> DD: Yeah, just tell him it fell through. Now if nothing happens by Friday next week, I'll call you for another appointment. But the two things I would like, one was the price and two, I don't like giving 50% down because if something doesn't happen, if something doesn't happen [UI] . . .

20.     The cooperating witness asked if he/she should give his/her guy another number (*i.e.*, a lower price), and Dvorkin told the cooperating witness to "leave it alone" for now.

21.     At the conclusion of the meeting, the cooperating witness again asked what the cooperating witness should tell his/her guy. The conversation was, in part:

> CW: Well, I guess, I ah, better get back. If ah [UI] . . . your person, let's talk. Let us know if something changes. I mean the guy is calling me.

DD:     You mean the guy in Florida?

CW:     Well he's not, personally, but the person in Florida.

DD:     Well first of all the price is way out of sight.  The other piece of it is the target range.

CW:     Yeah.

DD:     About whether he can get it done or not.

CW:     Yeah . . . right . . .

DD:     And then two, the deposit amount is a matter.  Because this is . . . ya know . . .

CW:     Yea . . .right

DD:     I don't mind paying the balance.

CW:     [UI] . . . I sent him the number you said.  That's what I told him.  And then he sent me back, 'ya know, with different numbers, which I told you before and . . .

DD:     What's the latest number?

CW:     I haven't talked to him since then.  But if you have one, I'll, I'll let him know.  I'll have to call him, though.  He's called me three times.

DD:     Tell him I've got somebody in the twenties.  They are only taking 10% down because if they don't get it done, I may never, I'll never see him again.  That's how life is.

CW:     Right, alright I'll tell him . . . twenties.

DD:     Yeah

CW:     Alright.  OK.  I'll let you know.

                                    . . .

16

## May 7 – Telephone Conversation Between the Cooperating Witness and Dvorkin

22.    At approximately 12:14 pm, the cooperating witness received an incoming call from Dvorkin's phone.  This call was recorded in the presence of FBI agents. During this call, the conversation included:

CW:    Hello?

DD:    Hi, [Cooperating witness].

CW:    Hey, Dan.  Hey, ah, alright, you're all alone?

DD:    Yes.

CW:    OK.  I know we weren't going to talk on the phone about this, but I, I, I talked to the guy and he's willing to accept the number that I gave him, that you told me?

DD:    Yes . . .

CW:    And he says that he can be here tomorrow and we, I mentioned a little bit about the downstroke on it.  And he says, ah, he's, he asked me if I was sure you finalized the payment and I, I agreed. And, ah . . .

DD:    Absolutely.

CW:    And he said . . .

DD:    But I started the other guy, I can't do anything till a week from, two weeks from last Friday.

CW:    Uh, two weeks from last Friday?  Ok.

DD:    Yeah.

CW:    So not this Friday, but the following Friday?

DD:    Yes.

17

CW:   OK.   Umm, I can do that.   'Cause he said he could be here tomorrow and take care of everything by the weekend.

DD:   I understand.

CW:   OK.

DD:   OK.

CW:   Alright. So . . .

DD:   Thank you. Bye . . .

CW:   So talk to you next Friday?

DD:   A week from Friday.

CW:   A week from Friday. OK. Talk to you then.

DD:   [Cooperating witness]?

CW:   Yeah?

DD:   It'll be about the 18th.

CW:   The 18th. Alright. Let me know.

DD:   Thanks. Will do.

## May 7 – The Intended Victim Is Notified and FBI Confronts Dvorkin

23.     Shortly after the last call between Dvorkin and the cooperating witness on May 7, FBI agents in Texas located the intended victim and informed him of the threat against his life.

24.     FBI also interviewed Dvorkin. During the interview, Dvorkin denied any knowledge of a plan to kill the intended victim.

**May 11 – The Cooperating Witness Calls Dvorkin**

  25. At the behest of law enforcement, on May 11, 2012, the cooperating witness placed a recorded call to Dvorkin. The call was recorded in the presence of agents and included the following conversation:

DD: Hello?

CW: Hey, Dan?

DD: Yeah?

CW: Hey, it's [cooperating witness] calling.

DD: Yes.

CW: Um, look, I, ah, you know those people you talked about the other day, going and seeing you [referring to the FBI agents who questioned Dvorkin]? Well they came by my shop.

DD: [Cooperating witness, cooperating witness], tell me, I, I, know more than one [cooperating witness].

CW: Ah, [employer].

DD: Yes, yes, yes.

CW: OK.

DD: OK. Now we're on the same page.

CW: Alright. Well those guys came over to my shop today.

DD: Uh-huh.

CW: And they came inside, and started asking me . . . ya know . . . first they were real nonchalant about everything, looking around and stuff. And then they starting asking me if I knew you. And I'm like, yeah. . . . And y ya know they start saying, um, they start bringing up, 'ya know, Texas, and they showed me photos of you and I together that Tuesday out front, from when you were

19

leaving, they, they were doing surveillance. Ok? And they started asking me all these questions and 'ya know, I'm, I'm just playing dumb, ya know? I'm telling them, oh, I don't know anything about that.

DD:     [UI] say I was looking at guns.

CW:     Yeah, and that's basically what I told them. You were in there looking at guns. We were talking about, you know, a pellet gun that you had about fixing it up and stuff. And then they start showing me these photos, ya know, of, of you and I together and he was here talking about the guns.

DD:     [UI] and also about the real estate. [UI] and the units. I haven't even seen it yet.

CW:     Yeah, I didn't say that. But, um, and then he showed me a picture of this guy from Texas. And they said they've got 24 hour surveillance on this guy and they're protecting him. And then, and then they said, you know, do I know anything.

DD:     Do you want [UI] stop over there?

CW:     I don't want to go over there. I'm telling 'ya they're doing surveillance.

DD:     It's not a good idea. It's not a good idea for me to come over there. And it's not a good idea for me to come over there.

CW:     Yeah, if we're going to meet we need to go somewhere away from here. . . . But it scared the living shit out of me, Dan. I'm really fucking nervous. Ok? And then the guy had to ask me to take a polygraph test. . . . I just told him no. . . . And stuff like that. And they, I don't think they believed me. But they said, 'ya know, they said that, they said if something happens to this guy, that they are going to be back. And I'm like, I don't even know this guy.

DD:     Well all I can tell you is I told my lawyer the story, and he said if they ever come back here not to talk to 'em.

CW:     Alright. Well, what am I supposed to do though? They'll come back to me . .

DD: Tell them, look, you talked to your lawyer, your lawyer says not to talk to them. You have nothing to do with me except business. Normal business. . . . But, ah, but if I send you a lawyer, you may serve papers. But that's it. You have nothing to do with it.

CW: Right.

DD: I haven't heard a word since they were here.

CW: OK.

DD: And I've completely erased the thought out of my mind.

CW: OK.

DD: With them or anything about this guy.

CW: Well, you know, I left the shop, and I just, I took a million turns, I'm in Oakbrook Mall, I'm sitting inside between a bunch of cars in the parking lot because I didn't know if they were following me or what, so I was making real sure not to make it real clear on that I was calling you, but I mean is everything over? Did 'ya . . . is everything stopped? Because if anything happens . . .

DD: As far as I know, it's all legal, it's all stopped. I am going to file a Chapter 11 reorganization. The only thing I do now is through attorneys. And, 'ah, I don't know, this guy, this guy sounds like a nut to me.

CW: Yeah. Well they scared the living shit out of me, I tell 'ya that. I didn't know what the fuck was going on . . .

DD: Well somebody must have scared the living shit out . . . you know I've never met this guy, I haven't talked to him in over a year. And, I'm just going to get on with my life. We're appealing the case. I'm just doing legal things. I have to spend money for lawyers now and nothing else and I have to do a lot of paperwork.

CW: Right. Well ok, yeah, I just, alright, if they come back, I'll tell 'ya. And 'ya know I tried to find that information from that cop. But he said he doesn't know anything. So I didn't even get anywhere on that. You know . . .

21

DD:    Forget about it.

CW:    Alright.  Alright, I'm going to do that.

. . .

## CONCLUSION

26.    Based on the information above, I believe there is probable cause that Daniel Dvorkin committed solicitation to commit a crime of violence, in violation of Title 18, United States Code, Section 373(a).

FURTHER AFFIANT SAYETH NOT.

ADAM M. HOOGLAND
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 3, 2012.

YOUNG B. KIM
United States Magistrate Judge

22