UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 12 CR 500 |
| v. | Judge Edmond E. Chang |
| DANIEL DVORKIN | |

### GOVERNMENT'S SENTENCING MEMORANDUM

When defendant Daniel Dvorkin was faced with the prospect of paying over $8 million to Larry Meyer's company, he opted to hire a hit man to kill Meyer rather than pay the judgment. To date, defendant has neither shown remorse nor taken any responsibility for his actions. Rather, at trial and in his post-trial briefings, defendant has portrayed *himself* as the victim, an old, infirm, talkative man who never intended to hurt Meyer. However, the evidence at trial revealed that defendant was anything but the victim. Rather, the evidence revealed defendant to be a calm, cool, collected business man who negotiated the price of a hit man as though he were closing a real estate deal, who showed only real concern for his bank account over the life of Meyer.

The Presentence Investigation Report calculates the advisory Guidelines range to be 262 to 327 months' imprisonment. The government has no objection to the PSR, or its application of a two-level increase to the Guideline calculation in light of defendant's attempts to obstruct the investigation and his prosecution. However, the government recognizes that the advisory Guideline range is lengthy, particularly for someone of defendant's age and health. Defendant chose to commit this offense when he was in his 70s with medical issues, however, and he still must face the serious consequences that flow from his very serious crime. In light of these

circumstances, we recommend that the Court sentence defendant to a term of imprisonment no less than 11 years, to account for the ten-year statutory maximum on one 18 USC 1958(a) charge, plus one year to account for defendant's obstruction of justice.

## BACKGROUND

On August 30, 2013, a jury found defendant guilty of one count of solicitation to commit a crime of violence (namely, the murder of Larry Meyer), in violation of Title 18, United States Code, Section 373 (Count One), and five counts of the use of interstate commerce facilities in the commission of murder-for-hire, in violation of Title 18, United States Code, Section 1958(a) (Counts Two through Six) (Dkt. No. 102).

This Court is well versed in the facts of this case, having heard the evidence at trial and read the parties' post-trial memoranda that summarized that trial evidence. Accordingly, the government herein incorporates its summary of the evidence from its response to defendant's motion for judgment of acquittal or a new trial, Dkt. No. 146, rather than repeat it all again.

## ARGUMENT

**I.      Probation's Guideline calculation is correct.**

The Presentence Investigation Report correctly calculations defendant's adjusted base offense level for Counts One through Six to be 39.  *See* PSR at ¶¶25-36.

**a)      Offense Level Calculations**

Count One

The base offense level is 33, pursuant to Guideline § 2A1.5(a).   PSR at ¶25.

The base offense level is increased by 4 because the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, pursuant to Guideline § 2A1.5(b).   PSR at ¶26.

2

The base offense level is increased by 2 because defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, pursuant to Guideline § 3C1.1.   PSR at ¶31.

Accordingly, the adjusted offense level for Count One is 39.   PSR at ¶33.

Counts Two through Six

The base offense level is 33, pursuant to Guideline § 2E1.4(a)(2).

Grouping Counts One through Six

Pursuant to Guideline § 3D1.2(b), Counts One through Six of the indictment are grouped together.

Pursuant to Guideline §3D1.3(a), the offense level applicable to the grouped counts is the offense level corresponding to the most serious of the counts comprising the Group.

Accordingly, the adjusted base offense level for Counts One through Six is 39. PSR at ¶36.

**b)** **Criminal History**

The PSR cites no criminal history.  PSR at ¶¶37-39.   Accordingly, defendant's criminal history points equal zero and defendant's criminal history category is I.   PSR at ¶39.

**c)** **Anticipated Advisory Sentencing Guidelines Range**

Therefore, as stated in the PSR, the anticipated offense level is 39, which, when combined with the anticipated criminal history category of I, results in an advisory Sentencing Guidelines range of 262 to 327 months' imprisonment, in addition to any supervised release and fine or restitution the Court may impose.

**II.      Defendant's conduct warrants a two-level enhancement for obstruction of justice.**

The Guideline calculation should be increased by two levels as a result of defendant's obstruction of justice, relating to both defendant's comments to Robert Bevis on May 11, 2012, after the FBI confronted defendant about the plot to murder Larry Meyer, and defendant's comments to Ellie Farkas after she testified in the grand jury and defendant was under criminal complaint.[1]

Guideline U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Guideline § 3C1.1. The Guidelines provide examples of obstructive conduct, which include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." Guideline§ 3C1.1, Application Note 4(A).

Here, defendant attempted to obstruct and impede the investigation when he told Bevis to lie to law enforcement about why defendant went to Bevis' gun store on May 8, the morning after the FBI approached defendant about the plot to murder Larry Meyer. Specifically, during a portion of their conversation on May 11, 2012, defendant instructed Bevis to lie to law enforcement about what defendant and Bevis discussed on May 8, 2012:

> BEVIS:       Alright, well those guys came over to my shop today.
> DVORKIN:  Uh huh.
> BEVIS:       And they came inside and started asking me, you know first they
>                   were real nonchalant about everything.   Lookin' around and stuff.

---

[1] While Probation found defendant's comments to Farkas to be "too vague" to support an obstruction of justice enhancement, Probation did find that his comments to Bevis during the May 11 call were sufficient to apply the two-level enhancement.   PSR at ¶29.

4

|  |  |
|---|---|
|  | And then they started asking me if I know you and I'm like, ah, well yeah you're the landlord and (clears throat) you know I and, and they started saying, ah, they started bringing up, you know Texas and they, they showed me photos of you and I together that Tuesday out front, you know as you were leavin'. They're, they're, they're doin' surveillance. Okay. And they started asking me all these questions and, you know and I'm, I'm just playin' dumb, you know. I'm tellin' 'em I don't know anything about that and, you know they wanted to know-- |
| DVORKIN: | Tell them I was looking at guns. |
| BEVIS: | Yeah that's basically what I told 'em you're in there lookin' at guns. We were talkin' about a, you know, ah, a pellet gun that you have about fixin' it up and stuff and, and then they, they start showing me these photos, you know of, of you and I together and I said yeah he was here talkin' about the guns. And then they, ah, they asked me if I-- |
| DVORKIN: | Hey and also we talked about the real estate. |
| BEVIS: | Yeah, well I didn't-- |
| DVORKIN: | Your new unit. |
| BEVIS: | I-- |
| DVORKIN: | I haven't even seen it yet. |

Gov't Ex. 7 Tr. at 1:14-2:17. While defendant did not say the words, "lie to the agents," his message and intent to Bevis in that call were clear – defendant wanted Bevis to falsely tell agents that defendant was in Bevis' gun shop to look at guns and talking about real estate. S*ee* Tr. at 520-21; s*ee United States v. Robinson*, 14 F.3d 1200, 1203-04 (7th Cir. 1994) (affirming district court's finding of obstruction of justice based on defendant's coded conversations to co-conspirator to shade the truth and not cooperate with the government despite the fact that defendant did not expressly tell the co-conspirator to lie). Defendant obstructed justice and a two-level enhancement is appropriate.

Defendant also attempted to obstruct and impede justice when he approached his longtime employee and family friend, Farkas, and tried to intimidate her from telling the truth. At trial, Farkas testified that she worked for defendant for over eleven years, and that she knew defendant and his wife for over fifteen years. Tr. at 690-92. Farkas testified that she had a

personal relationship with both defendant and his wife, over the years attending Dvorkin family affairs, playing Mahjong with Mrs. Dvorkin, and singing in the choir with Mrs. Dvorkin at their synagogue. Tr. at 692. While this was excluded at trial pursuant to defendant's motion *in limine*, Farkas told investigators that defendant approached Farkas after he was charged by criminal complaint and after she testified in the grand jury. According to Farkas, defendant asked her "You don't want to see me go to jail, do you?" Farkas stated that she replied, "no," and then walked away from defendant to end the conversation. When asked what she understood defendant to mean when he asked her that, Farkas replied, "Don't say anything bad." She also stated that she felt intimidated.

Though subtle and implied, when defendant approached Farkas, a longtime employee and family friend, he, again, attempted to impede and obstruct justice. *See, e.g., United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991) (affirming district court's finding that a letter from the defendant to a codefendant which said, falsely, "you don't know anything" about the subject matter of the prosecution was "a subtle and somewhat clever attempt to tell [the codefendant] 'don't spill the beans'" sufficient to support an obstruction of justice enhancement); *United States v. Strode*, 552 F.3d 630, 635 (7th Cir. 2009) (affirming district court's application of Guideline § 3C1.1: "Though Strode never explicitly stated that he did not want Askew and Conway to cooperate with the government, indirectly implying a need for everyone to keep quiet is not a barrier to an obstruction enhancement.").

For all of these reasons, the PSR correctly applied a two-level upward variance to the Guideline calculation, pursuant to Guideline § 3C1.1.

**III.    The factors set forth in 18 U.S.C. § 3553(a) warrant a sentence of no less than 11 years' imprisonment.**

The factors set forth in Section 3553(a) make clear that a sentence of no less than 11 years' imprisonment is appropriate here.

**A.    The Nature, Circumstances, and Seriousness of the Offenses.**

The nature, circumstances, and seriousness of the offenses favor a sentence of at least 11 years' imprisonment. *See* 18 U.S.C. §§ 3553(a)(1) & (2)(A). First, it goes without saying that soliciting a murder-for-hire is a very serious crime for the obvious reason that the intended goal of the crime is murder. Thankfully, here, Larry Meyer was not murdered. However, that does not, and should not, detract from the seriousness of the crime. Defendant had Farkas locate Meyer – instructed her to even find his synagogue in Austin, Texas – and then defendant took the pages Farkas printed, which included a photo of Meyer, and handed them to Bevis *after* they returned to defendant's office following their conversation in the parking lot about locating a hit man. Tr. at 386-88, 698-99; Gov't Exs. 8B and 8C. In addition, defendant created the real risk that two people could have ended up dead, as one of the handouts that Farkas printed for defendant identified a different Larry Meyer, *see* Gov. Ex. 8C. Moreover, the mechanics of the solicitation itself, specifically the distance, anonymity, and lack of accountability that existed between defendant and the hit man created the very real risk that the plan, once hatched, was very difficult to stop.[2] Try as he might to portray this as "just talking," in his asking Bevis to locate a hitman

---

[2] Dvorkin himself emphasized both the need for anonymity and the practical risk that he could not guarantee the result. *See, e.g.,* Gov. Ex. 3 Tr. at 5:7-10 ("I don't wanna know his [name]"); *id.* at 6:21 ("I don't wanna know his name."); Gov. Ex. 4 Tr. at 1:14-15 ("The other avenue only wanted ten percent down. You know the no refunds in this kind of work."); *id.* at 2:4-5 ("I don't know which group finally took it. He had two groups one was Mexican and one was Russian. I actually don't wanna know."); *id.* at 2:17-19 ("Now if nothing happens by Friday after next week I'll call you for another appointment. And we'll go . . . ."); *id.* at 3:19 ("Now whether they get it done or not."); *id.* at 4:1-15 (remarking several times that the cheaper assassin may not get the job done).

7

and providing Meyer's name, photo, and location to Bevis, defendant unleashed (and stuck with) a chain of events that, but for Bevis going to the police, could have spiraled out of control and could have resulted in the death of Meyer.

Second, the nature, circumstances, and seriousness of the crime must also account for the true victim in this case, Dvorin's intended target, Larry Meyer. The defendant's actions had an extraordinarily negative and traumatic impact on not only Meyer, but on his family and employees. In his Victim Impact Statement, Meyer recounted how, after learning that he was the target of a murder plot, his wife's brother and mother both passed away and how the family had to attend the funerals in Georgia accompanied by private security. Meyer's family members have sought counseling as a result of defendant's crimes. What the Meyer family has endured should factor heavily in the Court's determination of an appropriate sentence.

**B.     History and Characteristics of the Defendant, and the Need for Deterrence and to Promote Respect for the Law.**

A sentence of at least 11 years' imprisonment is appropriate in this case to take account of defendant's history and characteristics, as well as the need for deterrence and to promote defendant's respect for the law.

With respect to defendant's history and characteristics, defendant is a man motivated by greed, looking for an easy way out, with no regard or respect for human life or the law. By all accounts, over the years defendant built a successful commercial real estate practice and lived a very comfortable life. The investigation and witness accounts revealed that the defendant and his wife lived in a large home, flew around on private planes, threw frequent parties, and generously donated to charitable and religious organizations. But when the $8 million judgment was entered (relating to private planes he purchased years earlier), defendant himself was personally liable

(along with his two LLCs). *See* Gov. Ex. 9; Tr. at 229-30. And in spring 2012, after the mediation fell apart and his prospects to stay collection on the judgment grew bleaker and bleaker, defendant opted to pursue hiring a hit man to kill Meyer rather than just pay the money.

The Court should also take account of Dvorkin's very cool, calm, and collected manner during the recorded conversations that defendant had with Bevis. Defendant haggled over the price of a hit man as though he were negotiating the price of a car. Defendant displayed no regard for human life. Nor did he ever end the plan to murder Meyer of his own volition. Rather, defendant only stopped the plan when he knew that law enforcement was onto him.

Moreover, defendant has shown no remorse for his actions, nor has he accepted responsibility. Instead, he portrayed at trial, and continues to portray, Bevis as the criminal in this case. But for Bevis, however, Meyer might be dead right now.

Defendant also sought to impede the investigation. Defendant told Bevis to lie to federal agents after defendant had been approached by the FBI and was, thus, aware that the FBI was investigating him in relation to a murder-for-hire scheme. Later, after he was criminally charged and knew that Farkas' computer has been searched and that she has testified in the grand jury, he exploited their history and friendship by attempting to guilt her into lying. Such arrogant actions reflect a man who believes he is above the law.

Finally, a significant sentence is necessary in this case not only to deter defendant but to deter others, to send the strong signal that there are significant repercussions if you choose this path of soliciting a hit man to deal with your problems. While defendant's age and health should be considered by the Court, clearly those conditions did not prevent him from committing the crimes for which he now stands convicted and he, personally, needs to be deterred as well. A significant sentence will send the proper message, not just to defendant but to all people of all ages

9

and circumstances, that no one is above the law.

The government acknowledges that the defendant is now 76 years old and suffers from various health conditions. But those two factors should not result in a free pass for defendant in this case, where the crime was seriousness, the impact to Meyer and his family significant, and the strong need to generally deter others. Nor should those factors overshadow defendant's history and characteristics, particularly his conduct and demeanor as they relate to the instant offenses – a man who regards his personal finances over the life of Meyer and arrogantly obstructs justice. However, the government recognizes that the advisory Guideline range is lengthy in light of defendant's age and health. In light of that, and taking into account the factors discussed above, the government recommends that the Court sentence defendant to no less than 11 years' imprisonment.

## Conclusion

The government seeks a sentence of not less than 11 years' imprisonment in this case. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from future crimes of defendant, properly account for defendant's history and characteristics, and ensure a fair and uniform sentence.

Dated: June 26, 2014                     Respectfully submitted,

                                              ZACHARY T. FARDON
                                              United States Attorney

By:    */s/ Heather K. McShain*
          HEATHER K. McSHAIN
          JEFFREY D. PERCONTE
          Assistant United States Attorneys
          United States Attorney's Office
          219 South Dearborn Street
          Chicago, Illinois 60604
          (312) 353-1414

**CERTIFICATE OF SERVICE**

      The undersigned Assistant United States Attorney hereby certifies that, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electric Case Filing (ECF), the Government's Sentencing Memorandum was served on defense counsel pursuant to the District Court's ECF system, on June 26, 2014.

By:  /s/ *Heather K. McShain*
       HEATHER K. McSHAIN
       Assistant United States Attorney
       219 S. Dearborn Street
       Chicago, Illinois 60604
       (312) 353-1414