UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

                                                                            12-cr-500 (EEC)

       -vs-

DANIEL DVORKIN et. al.,

                        Defendants.
-------------------------------------------------------X

## MEMORANDUM OF LAW IN AID OF SENTENCING
## ON BEHALF OF
## DANIEL DVORKIN

**Timothy C. Parlatore, Esq.**
**Bruce Cutler, Esq.**
260 Madison Avenue 22ND floor
New York, New York 10016
Telephone (212) 679-6669
Facsimile (212) 202-4787

**PRELIMINARY STATEMENT**

We respectfully submit this sentencing memorandum on behalf of Defendant, Daniel Dvorkin, a 76 year old defendant with no prior criminal history, to assist the Court in determining an appropriate sentence for him.

There are a variety of factors which the Court must consider in determining the appropriate sentence; not simply the offense of conviction, but the history and characteristics of the defendant as well as other extrinsic factors.

Attached to this submission as Exhibit "A" are support letters from Mr. Dvorkin's family members and friends, which will provide insight into Mr. Dvorkin's character and current behavior, a component that is necessary to fashion the appropriate sentence.

**DISCUSSION**

**I.    LEGAL STANDARD**

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 128 S.Ct. 554,574 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 128 S.Ct. 586, 596 (2007). It is the sentencing judge who

1

has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 128 S.Ct. at 574, *citing Gall*, 128 S.Ct. at 597.

In determining a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. §3553(a) states:

> The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed
>
>     (A)    to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
>
>     (B)    to afford adequate deterrence to criminal conduct;
>
>     (C)    to protect the public from further crimes of the defendant; and
>
>     (D)    to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for-
>
>     (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines…;
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of

2

>title 28, United States Code, subject to any amendments made to such policy statements by act of Congress…
>
>(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>(7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. §3553 (a).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 597. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 128 S.Ct. at 570, *citing* 18 U.S.C. §3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. §3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599.

## II. THE ADVISORY GUIDELINES RANGE

The pre-sentence report provides for the following estimated offense level under the United States Sentencing Guidelines:

| | |
|---|---:|
| Base Offense Level (2A1.5(a) | 33 |
| Offer of something of pecuniary value (2A1.5(b)) | +4 |
| Obstruction of Justice (3C1.1) | +2 |
| **Adjusted Offense Level** | **39** |

With Mr. Dvorkin's criminal history (Category I), this yields a recommended guideline range of 262-327 months. This is the same guidelines range advocated by the Government.

However, the Defendant objects to the inclusion of additional points for Obstruction of Justice. The Government has argued that these points are applicable because Dvorkin allegedly attempted to persuade both Robert Bevis ("Bevis") and his assistant Ellie Farkas to lie to FBI agents. The Probation Officer properly rejected the Government's argument regarding Ms. Farkas (PSR ¶31), but accepted their argument regarding Bevis.

"To establish an obstruction of justice, the sentencing court must make an independent factual finding that the defendant engaged in a willful attempt to provide false testimony." *United States v. Smith*, 103 F.3d 600, 606 (7th Cir. 1996) (citation omitted). When a defendant objects to an enhancement for obstruction of justice, the district court must review the evidence and make an independent determination as to the existence of the willful obstruction of justice. *See United States v. Menting*, 166 F.3d 923, 929 (7th Cir. 1999).

4

Under §3C1.1, materially false statements made to law enforcement are only covered where the statement "significantly obstructed or impeded the official investigation or prosecution of the instant offense." *Id.* Application Note 4(G).

The Seventh Circuit has previously held that attempts at obstruction of justice which have no consequences are not a permissible basis for enhancement. *United States v. Kroledge*, 201 F.3d 900, 908 (7th Cir. 2000), *citing United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998) (obstruction of justice enhancement only appropriate where defendant actually caused investigators to pursue a "wild goose chase") and *United States v. Barnett*, 939 F.39 F.2d 405, 407 (7th Cir. 1991) (enhancement was improper where false statements did not significantly obstruct or impede the investigation).

In the case at bar, Dvorkin's statements to Bevis, a cooperating witness, had absolutely no effect on the investigation. The Government cannot credibly argue that his conduct obstructed or impeded the investigation, or had any consequences whatsoever.

Additionally, while the PSR states that Dvorkin's conversation with Bevis seemed clear that he was coaching him on what lies to tell, there is nothing to suggest that Dvorkin threatened, intimidated, or unlawfully influenced Bevis, as required under §3C1.1, Application Note 4(A). Mere coaching is insufficient.

Moreover, even if coaching were sufficient, the excerpts quoted by the Government illustrate that it was Bevis, not Dvorkin, who initiated the discussion of not providing the FBI with truthful information. Before Dvorkin said a word, Bevis stated that "I'm just playin' dumb, you know. I'm tellin' 'em I don't know anything about that."

This entire conversation was a retelling of Bevis' *past* meeting with FBI agents, not a coaching session for future meetings. This was the same conversation where Dvorkin

5

clearly renounced any intention of moving forward with plans to harm Mr. Meyer, so there was no expectation that Bevis even would have additional conversations with FBI agents where he could tell lies fed to him by Dvorkin.

For all these reasons, the enhancement for obstruction of justice is not warranted and should be disregarded.

### III. SENTENCING OPTIONS AVAILABLE

Mr. Dvorkin's appropriate adjusted offense level is 37 with an advisory guideline range of 210-262. However, both the Government and the Defense agree that under 18 U.S.C. §3553(a), a non-guidelines sentence should be imposed. The divergence between the Government's analysis and that of the defense is how far below the guidelines the Court should impose sentence.

Mr. Dvorkin is eligible for not less than one nor more than five years probation. *PSR* ¶114, 115. The statutory maximums are five years incarceration for Count 1 and ten years for Counts 2 through 6. *PSR* ¶108. The Government has argued that the Court should impose the statutory maximum of ten-years' incarceration on one 18 U.S.C. §1958(a) charge, plus one additional year for obstruction of justice. For the reasons discussed *supra*, the Court should reject any enhancement for obstruction of justice. Additionally, the Defense submits that the statutory maximum of ten-years is excessive, considering the §3553(a) factors.

### IV. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

6

As discussed more fully in the Defendant's Motion for a Judgment of Acquittal or a New Trial, this case is drastically different from the usual "murder-for-hire" scenario.[1] Even if this Court rules that Dvorkin's intemperate discussions with Bevis rise to the level of attaching criminal liability, Dvorkin never carried through with the plan. No money exchanged hands and Mr. Meyer was never placed in any physical danger.[2]

The Government has argued that Mr. Dvorkin "negotiated the price of a hit man as though he were closing a real estate deal." However, the sequence of conversations between Dvorkin and Bevis, after the initial conversation, which was not taped, show that Dvorkin was negotiating in bad faith, in a deliberate effort to avoid reaching an agreement which would have placed Mr. Meyer in actual danger. Consider the sequence of negotiations:

1. When Bevis offered $80,000, Dvorkin refused and said he only had $50,000.

2. When Bevis offered $50,000, Dvorkin again refused and could not go above $20,000.

3. When Bevis offered $20,000, Dvorkin refused a third time and pushed him off for two weeks.

Essentially, Dvorkin first asked for a 37.5% discount. When Bevis agreed, Dvorkin asked for a 60% discount off the new price. When Bevis again agreed (for a total of 75% off the original price), Dvorkin still refused. If the above described negotiation pattern were followed in any other business transaction, such as a car, or a real estate transaction,

---

[1] At present, the Motion for a Judgment of Acquittal or a New Trial is still pending. Defendant maintains the legitimacy of those arguments. Nothing in this submission should be misconstrued as an admission or concession regarding those arguments.

[2] The Government has submitted a "Victim Impact Statement" from Mr. Meyer, which details how the FBI terrified Mr. Meyer and his family by placing them under 24-hour security. While Mr. Dvorkin regrets that Mr. Meyer was put through such a traumatic experience, he maintains that this was a gross overreaction by the FBI.

as the Government suggested, no intelligent salesperson would believe that Dvorkin wanted to actually close the deal.

Thus, even if this Court finds that Dvorkin's initial conversations rose to the level of criminal liability, given his subsequent actions and the appropriate context, his conduct was not so egregious as to warrant the statutory maximum punishment.

## V. DANIEL DVORKIN'S HISTORY AND CHARACTERISTICS

While Mr. Dvorkin stands before the Court to be judged on the bad decisions he has made in his life, we must also consider his positive personal characteristics and history.

### a. Mr. Dvorkin's Advanced Age and Failing Health

Additionally, we would ask that the Court consider Mr. Dvorkin's age and physical condition, both for a departure pursuant to §5H1.1 and §5H1.4, as well as a §3553(a) factor.

As detailed extensively in Mr. Dvorkin's bail application, he suffers from a multitude of medical issues, including:

1. Aggressive prostate cancer
2. Degenerative joint disease of the spine and the knees
3. Obesity with consequential impaired mobility, especially in view of arthritis
4. Obstructive sleep apnea
5. Coronary heart disease
6. Cerbero-vascular disease manifesting as a stroke (CVA)
7. HTN exacerbated by obesity and immobility

Ultimately, when these medical conditions are taken into consideration, along with Mr. Dvorkin's advanced age, the decision the Court must make is whether to impose a *de facto* life sentence upon Mr. Dvorkin. The Defense submits that the sentence advocated by the Government, while lower than the advisory guidelines range, would still result in Mr. Dvorkin spending his final days in jail.

In *United States v. Johnson*, 685 F.3d 660 (7th Cir. 2012), Judge Posner examined the issue of an elderly defendant and found that the Courts should take into consideration tables of life expectancy, as promulgated by the U.S. Census Bureau:

> We have wrestled in previous cases with the question whether life expectancy statistics should figure in sentencing for offenses for which Congress has not authorized a life sentence. Our court has concluded, as have other courts, that a sentence which although it is a term of years is likely or even certain to be a de facto life sentence because of the defendant's age is improper if the statute under which he was convicted provides that only a jury can authorize a life sentence.

*Id.* at 663, *citing United States v. Martin,* 63 F.3d 1422, 1432-34 (7th Cir. 1995), abrogated on other grounds by *Jones v. United States,* 529 U.S. 848, 850-51, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000); *United States v. Martin,* 115 F.3d 454 (7th Cir. 1997); *United States v. Martin,* 100 F.3d 43, 46, 48 (7th Cir. 1996); *United States v. Prevatte,* 66 F.3d 840, 846-49 (7th Cir. 1995) (concurring opinion); *United States v. Tocco,* 135 F.3d 116, 131-32 (2d Cir. 1998); *United States v. Gullett,* 75 F.3d 941, 950-51 (4th Cir. 1996); *United States v. Williams,* 775 F.2d 1295, 1299 (5th Cir. 1985); *United States v. Hansen,* 755 F.2d 629, 631 (8th Cir. 1985).

Following Judge Posner's direction, an examination of the 2012 U.S. Census Bureau Statistical Abstract, Table 105 shows that a 75 year old white male has an average of 10.6 years of life remaining.[3] Mr. Dvorkin's medical conditions surely place him on the lower end of the spectrum of life expectancies, plus he turned 76 while on remand, leaving much less than 9.5 years life expectancy remaining. Thus, the 11-year sentence advocated by the Government would be a *de facto* life sentence, which is not authorized for Mr. Dvorkin's offense of conviction.

---

[3] A copy of this table is annexed hereto at Exhibit "B."

Moreover, the Sentencing Guidelines state that "age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1 (Age Policy Statement); *see also United States v. Bullion*, 466 F.3d 574, 576 (7th Cir. 2006).

### b. Letters from Mr. Dvorkin's Family and Friends

The Government has argued that "[w]ith respect to defendant's history and characteristics, defendant is a man motivated by greed, looking for an easy way out, with no regard or respect for human life or the law." Aside from this conclusory and inflammatory statement, the Government makes no effort to provide any support for this position, other than his offense of conviction. However, 18 U.S.C. §3553(a) requires that the Court look beyond the offense of conviction and consider Mr. Dvorkin's full 76 year history and an examination of the multitude of letters submitted on Mr. Dvorkin's behalf illustrate the baselessness of the Government's statement.

The reality is that Mr. Dvorkin has a long track record of extraordinary generosity and compassion for others. The letters are replete with examples of Mr. Dvorkin lending his own expertise and financial successes to those less fortunate.

Mr. Dvorkin's son, Aaron, writes of his father's generosity towards others:

> My father is a "self-made man" who has been in the real estate business his entire adult life. He has shared his success not only monetarily but by having a positive impact on the community as well as the people that he interacts with professionally and personally. My father has helped many small businesses stay in business during economic downturns by deferring or forgiving rent. He has also helped young electricians and HVAC technicians through school and taught young, aspiring entrepreneurs to become real estate owners, landlords, and business persons. I am very proud

> when I meet someone and they tell me how my father helped them get to where they are in life.

*Exhibit "A,"* p. 1-2. In addition, Aaron shares a very personal story of how his father taught him the importance of taking responsibility:

> One of the most important ways that my father helped me was with regard to my responsibilities towards my son, Micky, who is now 21 years old. At the time my son's mother became pregnant, I was unsure if I was the father. I was 18 years old and I did not have a relationship with my son's mother. I feared that she was not telling the truth about the paternity of the child. My father encouraged me to take a paternity test. My father was very concerned about the welfare of this unborn child. He wanted me to take responsibility for my actions and be a father to the child if the child were in fact mine, I am not sure I would have voluntarily taken the test without my parents' gentle persuasion. Maybe I was afraid of the outcome and the responsibilities it would entail. As it turns out, the baby was my son. I am so very grateful to my parents for opening my eyes to the importance of this situation. During the first few years of Micky's life I was in the army, but my parents made sure to see Micky to help him and his mother out financially while I was away. Today, I can't imagine Micky not being a part of my life. I have my father to thank for making sure that Micky is a part of my life.

*Exhibit "A,"* p. 1.

Mr. Dvorkin's wife of 47 years, Francine, echoes this same sentiment with a moving story of how Mr. Dvorkin assisted her parents, who were survivors of the holocaust, to live out their final years comfortably, safely, and with dignity:

> Dan is truly a man that has a heart of gold. From the moment I met Dan to this day, this is a true statement about him. When my parents, who were Holocaust survivors and immigrants to the United States, came here in 1948, they had nothing. All had been lost when Hitler invaded Belgium, where they lived. Upon arrival here, my parents worked very hard and built up a fur business. While it was somewhat successful, it wasn't anything on which they could retire. When retirement time came for them, Danny helped my parents buy a building in Lombard with what little funds they had accumulated. The plan was for them to live on the income from that building. The building, however, never made enough money for that to happen. My parents never knew about this because Danny supplemented the

11

> financial shortfall each month. They, then, could live their golden years out comfortably. Likewise, when the neighborhood my parents lived in became unsafe for them to live there, Danny bought them a house in a safe neighborhood and helped them move. Danny did this all on his own and without my prompting.

*Exhibit "A,"* p. 3.

Francine's neice, Miriam Solomon, lists several instances where she saw Mr. Dvorkin go above and beyond to help those in need, corroborating those discussed above and adding the following story:

> A few years ago, Dan and Fran hosted a relative, who came to visit and decided to stay for a while in Chicago to work and save money. Dan helped him to find a job in construction. A few months later, that relative was diagnosed with brain cancer. He obviously didn't have health insurance, so Dan helped with all the expenses of the treatment, surgery and chemotherapy. We were very touched by this. Sadly, that young person had passed away.

*Exhibit "A,"* p. 5.

Francine's brother, Simon Golden, writes of how Mr. Dvorkin helped him after he was diagnosed with cancer:

> Several years ago I had made arrangements to spend some time in Florida during the winter. In the meantime I was diagnosed with cancer and started chemotherapy. My physician told me I could not fly on a commercial airline flight with my immune system totally suppressed. When Dan found out about this, he immediately told me not to change any plans because he would fly me and my wife down on a charter private plane, which he did at his expense. This was a gift that really made a big difference in my life at the time because I could continue my treatments in a much more benevolent environment.

*Exhibit "A,"* p. 7.

Donna Yesner, wife of Mr. Dvorkin's friend, Michael Yesner, writes of Mr. Dvorkin's kindness and caring for his friend:

> My husband had a very serious car accident near the Dvorkin home. When Dan heard about the accident, he rushed over to the hospital

> and insisted I stay at his house rather than travel the 35 miles to my home that night, so I could visit Mike the next day.
>
> About a year later, Mike was hospitalized again. Dan and Fran came to see him literally the day he was released on bond for the crimes he was tried for in your courtroom. He simply had to make sure his good friend was okay, despite the problems he, himself, had.

*Exhibit "A," p. 9.*

Although the Government has attempted to paint Mr. Dvorkin as a successful, but ruthless businessman whose main focus is on the financial bottom line, the letters from his business associates and tenants tell a very different tale:

1. Charles Hold – Mr. Dvorkin leased Mr. Hold a space below market value because he knew Mr. Hold was starting a new business and was tight on funds. Mr. Hold stated "I would not have made it without his help." *Exhibit "A,"* p 10.

2. Christine Simek – Mr. Dvorkin took a chance on this divorced, single mother who had been out of the work force for 14 years. Although she had no experience in real estate, Mr. Dvorkin taught her the industry, she earned her real estate license and she is now a successful property manager. *Exhibit "A,"* p 11.

3. Daniel Lopez – Mr. Dvorkin hired Mr. Lopez 17 years ago when he was out of work because his previous employer had declared bankruptcy and he suddenly found himself destitute with three small children. *Exhibit "A,"* p 12.

4. Gary Dorsay – Twice when Mr. Dorsey lost his jobs, Mr. Dvorkin gave him office space at a low price and assisted him to get back on his feet. The last

       time, Mr. Dvorkin formed a company, GD Ventures (GD stands for Gary and Dan) and made Gary a 10% owner. *Exhibit "A," p 13-15.*

5. John Earley – Former tenant with a seasonal business, which caused him to regularly be late with rent. For 15-20 years, Mr. Dvorkin allowed him to be late with his payments and even paid for maintenance repairs and improvements that he was not required to under the lease to help Mr. Earley's business. *Exhibit "A," p 16-18.*

6. Ross Duncan – a long-time employee of Mr. Dvorkin. Mr. Dvorkin lent Mr. Duncan money to allow him to keep his home with his children after his wife left him and the children in a divorce. *Exhibit "A," p 19.*

These are but a few representative examples of Mr. Dvorkin's long history of caring, compassion, and generosity. A total of 51 letters have been submitted, each of which tells a similar tale of a person in need who was helped by Mr. Dvorkin.

In addition to these people, Mr. Dvorkin has contributed to a large number of charitable organizations[4] and even donated approximately $1,000,000 to establish the Herschel and Rivtche Goldfarb Fund for Yiddish Chair, an endowed fund at the Yiddish Book Center in Francine's parent's honor after their death.

## CONCLUSION

For all the reasons stated herein, Mr. Dvorkin respectfully requests that the Court show leniency in imposing a sentence upon him. By the time he is sentenced, he will have

---

[4] A copy of Mr. Dvorkin's ledger of charitable donations is annexed hereto at Exhibit "C."

served just shy of a full year in prison. While Mr. Dvorkin is eligible for probation, home confinement, as recommended by the U.S. Sentencing Commission, would be equally as efficient as and less costly than continued incarceration, and is appropriate under these circumstances.